[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. FACTS
Autumn D. was born on October, 1999 to Linda and Philip D. In October 2000, Autumn was removed from her parents' care pursuant to a 96 hour hold and subsequent Order of Temporary Custody. The basis for the Order of Temporary Custody was unexplained bruising discovered on the child. Subsequently, after a court hearing, Autumn was returned to her parents' custody. The Department of Children and Families (hereinafter referred to as DCF) kept the case open and provided services to the parents until May of 2001. At that time, since then were no further concerns, DCF withdraw its pending petitions.
On June 14, 2001 Autumn was brought to the Danbury Hospital Emergency Department by ambulance. A CAT scan on that date revealed a frontal subdural hematoma. DCF transported Autumn to Yale New Haven Children's Hospital that evening. The emergency room aft ending doctor that evening, Dr. Arnold, discovered extensive bruising in both of Autumn's ears, on her neck, a bruise on her lower back, and small round marks all over her scalp of varying color. A number of the bruises were bright red, indicating that they were very fresh, probably occurring within one day of Autumn's arrival at the emergency room. The bruising in the ears appeared to have been caused by the child being "boxed" on each side of her head by someone's hands.
The parents indicated to the Hospital personnel that earlier on June 14, 2001 Autumn was doing well and acting normally. Autumn was seen by a number of physicians at the hospital including but not limited to, Dr. Linda Arnold, Emergency Medicine, Dr. Charles Duncan, Pediatric Neurosurgeon, Dr. Kathleen Stossle, Ophthalmologist and Dr. Jonathan Leventhal.
Dr. Charles Duncan reviewed the CAT scan and testified that due to the subdural hematoma, blood appearing white on the scan would indicate a very recent bleed, and that it would fade to gray as time elapsed. A review of the CAT scan indicates a white area at the location of the CT Page 2973 subdural hematoma. He testified, and the Court so finds, that a shaking or shaking impact occurred to this child within hours of the child's admission to the hospital. Based upon Dr. Duncan's testimony the court finds that a violent, purposeful act was needed to cause this type of damage and that, given the history, child abuse is the only conclusion, due to the subdural hematoma and retinal hemorrhaging.
Autumn experienced extensive retinal hemorrhaging both intra and pre-retinal, in both eyes. In the right eye the hemorrhaging encompassed the optic nerve, which may affect her sight as she develops. The Court finds that, based upon Dr. Stossle's testimony, some type of force was needed to create this type of retinal hemorrhaging.
On June 18, 2001 the petitioner, DCF, filed with the Court a Motion for Ex Parte Order of Temporary Custody and simultaneously, therewith, a Neglect Petition. On that date this Court issued the requested Ex Parte Order of Temporary Custody, (hereinafter referred to as OTC). The ten day hearing on the OTC was held on June 27, 2001. At that time, by agreement, the hearing on the OTC was consolidated with the Neglect Petition and scheduled for trial on August 20, 2001.
On July 17, 2001, DCF filed a Petition to Terminate the Parental Rights of both parents (hereinafter referred to as TPR). A hearing on the TPR Petition was scheduled for August 7, 2001. At the hearing on the TPR Petition held on August 7, 2001, the Court consolidated the trial on the TPR Petition with the trial on the OTC and Neglect Petition. DCF had also filed a Motion For Determination as to whether reasonable efforts to reunify the child with the parents were necessary. The Court marked the motion off and ruled that the reasonable efforts motion would also be heard at the trial.
The trial was held on the following dates: January 22, 23, 24, 25, 31 and February 1, 2002. Also, on February 19, 2002, the minor child moved, and the Court granted by agreement, to reopen evidence to add one additional fact to the effect that the mother had relocated to New Hampshire. The parties were afforded the opportunity to file briefs and all briefs were filed simultaneously on February 19, 2002.
At the trial, the parents testified, and the Court so finds, that Autumn was in the care of Marsha B. until late in the afternoon of June 11, 2001. Marsha B. is the mother of Philip D. The child remained in the care of either or both parents from the afternoon of June 11, 2001 until the emergency room visit in the evening of June 14 2001. The mother had been at work for several hours before Autumn was taken to the hospital. The father was caring for Autumn at the time the ambulance was called. CT Page 2974
Autumn spent five days at Yale New Haven Children's Hospital. She has received extensive birth to three services and will continue to require these services for a long time. It is imperative that her caretakers work with her on an ongoing basis to help her progress as optimally as possible. The full extent of her delays will not be known until she starts her schooling. Her development since her hospitalization has not been good.
Dr. Ruth Grant performed psychological examinations on both parents. She did not believe that reunification with the parents was in Autumn's best interests. Autumn has a lot of special needs and Dr. Grant believes that Autumn's parents cannot meet her needs. Dr. Grant was also concerned that both parents denied that it would be helpful or necessary to go into therapy.
Both parents denied hurting Autumn. They feel that the injuries were caused by the paternal grandmother who was with Autumn three days prior to the hospitalization. The parents further indicated to hospital personnel that Autumn had three seizures while in their care. Since being released from Yale and placed in foster care, Autumn has not experienced any seizures and is not on an anti-seizure medication. The injuries which Autumn sustained on June 14, 2002, according to all of the medical experts, could not have been caused by any seizure. Autumn's history both prior to June 14, 2001 and thereafter, according to the medical experts, was inconsistent with a seizure disorder.
II. LAW
The Termination of Parental Rights is defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent or parents so that the child is free for adoption." C.G.S. Sec. 45a-707 (8). "It is a most serious and sensitive judicial action." Anonymous vs. Norton,168 Conn. 421, 430, 362 A.2d 532 cert. Denied, 4223 U.S. 935, 96, S. CT 294, 46 L.Ed.2d 268 (1975); In Re Michael M. 29 Conn. App. 112, 117-18,614 A.2d 832 (1992). When petitioning to terminate parental rights without consent DCF must allege and prove by clear and convincing evidence one or more of the specific grounds set forth in Connecticut General Statutes 17a-112 (c) et seq. In Re Baby Girl B, 224 Conn. 263,293, 618 A.2d (1992).
Section 46b-129 (b) of the Connecticut General Statutes provides in relevant part, that when DCF has filed a Neglect Petition with the Court, if it appears from the specific allegations of the petition and other verified affirmation of fact accompanying the petition and application that there is reasonable cause to believe that (a) the child CT Page 2975 is suffering from serious physical illness or serious physical injury or is the immediate physical danger from his surroundings and (2) that as a result of said conditions, the child's safety is endangered and immediate removal from such surroundings is necessary to ensure the child's safety, the court shall either (b) issue and order ex parte vesting in some suitable agency or person the child's or youth's temporary care and custody. The parents have a right to contest the order by requesting a hearing. At the hearing the Court either sustains or vacates the OTC. InRe Juvenile Appeal, 189 Conn. 276 (1983).
Section 46b-129 (a) of the Connecticut General Statutes states that DCF may file a petition with the Court alleging that a child is neglected. Neglect is defined in Section 46b-120 (8) as among other things, (B) being denied proper care and attention physically, educationally, emotionally or morally, (C) being permitted to live under conditions, circumstances or associations injurious to his well-being, (D) has been abused, which is also defined in Section 46b-120 (3) as "abused" means that a child or youth (A) has had physical injury or injuries which are at variance with the history given of them.
Connecticut General Statutes Section 17a-112 (c) provides in relevant part: The Superior Court, upon hearing and notice as provided in Section 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that . . . (C) the child has been denied by reason of an act, or acts, or parental commission or omission . . . the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of commission or omission sufficient for the termination of parental rights. In Re Antonio M.,56 Conn. App. 534, 539-40 (2000). Section 17a-112 (c) authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to a child.Id. A. p. 534.
When the termination is based on a claim of serious physical injury, two criteria must be met to establish prima facie evidence for termination of parental rights: the physical injury must be serious, and it must be nonaccidental or inadequately explained. In Re Jessca M.49 Conn. App. 229, 241 (1998).
Autumn D. has sustained a serious physical injury. She incurred a subdural hematoma as the result of being shaken. She also sustained damage to her optic nerve which may permanently affect her vision, and she has been developmentally hindered since the episode. The Court further finds that Autumn's injuries were nonaccidental. They occurred CT Page 2976 due to the child being shaken. Even if the Court were to assume, arguendo, that Autumn's injuries were accidental, they certainly have been inadequately explained. The medical testimony is clear that Autumn's injuries occurred the day she was taken to the hospital. The parents had sole custody of Autumn for at least three days prior to the emergency room visit. The testimony of the parents at trial to the effect that Autumn was not herself after returning from Marsha B.'s house three days prior to the hospital is not creditable. The parents had informed both the hospital and DCF that Autumn was fine on the day she was taken to the emergency room. If the parents had concerns for Autumn's health for three days before she went to the emergency room, the Court queries why no medical personnel were contacted prior to June 14. The parents' testimony to the effect that Marsha B. caused Autumn's injuries is not consistent with either the medical testimony or with their prior statements. At the very least, the testimony of the respondents does not adequately explain Autumn's injuries. The Court finds that DCF has proven its ground for termination based upon clear and convincing evidence in that on Ground C of the Termination Petition it has proven that the child has been denied proper care by reason of an act or acts of commission or omission, including severe physical abuse or a pattern of abuse by the mother and the father. The prima facie cause for termination has been established under the dictates of In Re Antonio M. (supra) and In Re Jessica M. (supra).
Autumn has sustained severe physical abuse through the acts of her parents. The testimony of Dr. Duncan, Dr. Stossle, Dr. Arnold and Dr. Leventhal was uncontroverted to the effect that Autumn's injures were not accidental. The parents denied that they abused Autumn, yet they were the sole caretakers when the injuries occurred. "The young age of the child and the fact that the mistreatment occurred in the privacy of the family home demand that proof of the parents' failure to halt the mistreatment perpetrated by the other must rest largely upon circumstantial evidence.In Re Juvenile Appeal (85-2) 485 A.2d 1362, 3 Conn. App. 184 p. 1369 (1985)." "The law does not distinguish between direct and circumstantial evidence as far as proactive force is concerned." State vs. Cimino194 Conn. 210, 211, 478 A.2d 1005 (1984). In Re Cheyenne 756 A.2d 303,59 Conn. App. p. 307 (2001).
Dr. Duncan examined Autumn at Yale. The child's subdural hematoma was a very serious injury which was caused by considerable force. Subdural hematomas occur in children who have been in high speed automobile accidents, a fall from a second floor window, or have been shaken. In view of the history in this case it is clear and convincing that the child was shaken. Dr. Duncan also observed bruises on Autumn which were in different stages of healing. The neck and ear bruises had occurred within hours to one day of the hospital treatment. Some of the other CT Page 2977 bruises were of a longer duration. The medical evidence clearly demonstrates that this child was abused by the parents during the three days that they cared for her exclusively.
A. Termination is in the best interest of the child by clear andconvincing evidence.
1. Timeless, nature and extent of services offered
The parents were offered visitation, psychological evaluations, parent aid, parenting education and counseling. The parents were unwilling to participate in either counseling services or parenting classes. The parents underwent a psychological evaluation by Dr. Ruth Grant in July and August of 2001. In August, the mother informed Dr. Grant that she took great offense to the recommendations for therapy to address issues from her past. The mother denied any involvement and responsibility for Autumn's injuries and said "if it's not broken, why fix it?"
 2. The Department of Children and Families had made reasonable efforts to reunite the family pursuant to the Federal Adoption Assistance and Child Welfare Act of 1980. as amended.
The child suffered severe, permanent and life threatening injuries for which the parents either had no explanation, or their explanation was inconsistent with the child's nonaccidental injuries. The Department of Children and Families continued to offer services for the parents. DCF provided services to meet this requirement, however, the parents failed to complete or participate in all the services.
 3. Terms of any applicable court order entered into and agreed upon by any individual or agency and the parents and the extent to which all parties have fulfilled their obligation under such order.
On June 18, 2001 the court recommended that the parents comply with specific steps. Neither parent participated in individual counseling, parenting counseling, submitted to a substance abuse assessment or utilized recommended service providers. The parents did keep all appointments with DCF, kept their whereabouts known, cooperated with court orders, psychological evaluations, and visited the child as often as DCF permitted.
4. The feelings and emotional ties of the child with respect to the child's parents. and guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties. CT Page 2978
The child has exhibited no strong ties with either parent. She did not cry or show any emotions at the end of her visits with either parent. The child now appears happy to see her mother for visits. However, Autumn continues to have no issues separating from her mother. Autumn is well bonded to her new foster parents and cries when separated from them.
5. The age of the child.
Autumn D. was born on October, 1999. According to Dr. Grant it would be important to make a permanent plan for Autumn's care while she is young enough to bond with others.
 6. The efforts the parents have made to adjust such parents circumstance, conduct or conditions to make it in the best interest of the child to return such child home in the foreseeable future.
The parents have not adjusted their situation, conduct or condition to make it in the best interests of Autumn to return to them in the foreseeable future. They have not participated in any counseling services. They have not participated in parenting classes. Neither parent has accepted any responsibility for the life threatening abuse inflicted on this child while in their care. Autumn currently is experiencing delays in all areas of development. It is critical for her to be in a home with parents who are capable of working on her deficits. There have been times during the mother's one hour visitation that the mother has not been responsive to the child, and has shown minimal interaction with Autumn during the second half of her visits. She has also ended visits early.
 7. The extent to which a parent has been prevented from maintaining a relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any person or by the economic circumstance of the parents.
There has been no evidence presented that either of the parents has been prevented from maintaining a relationship with Autumn by the unreasonable act of another person or by economic circumstances.
Respondents argue that Autumn's injuries were adequately explained by the parents. The Court has found that the injuries were not adequately explained, and that the medical testimony was clear and convincing that some of the bruising was fresh and that the subdural hematoma was caused within one day of the child going to the emergency room. Respondents further claim that even if the injuries were not adequately explained, that they may not be serious enough to warrant termination. This CT Page 2979 contention is specious. The child was placed in a life threatening situation, may have permanent damage to her eyesight, and is currently not developing properly since the accident. The claim merits no further discussion.
Respondents further argue that DCF did not make reasonable efforts to try to reunify the parents with the child, in that it denied an increase in visitation which the parents requested through an administrative hearing. Reasonableness is an objective standard and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case. In Re Antonio M. 56 Conn. App. 534,547 (2000). Reasonable efforts means doing everything reasonable, not everything possible, but such efforts should not make it impossible to attain reunification in a given case. In Re Amber B. 56 Conn. App. 776,784 (2000). The court has found that DCF used reasonable efforts in this matter. The court has considered the totality of the circumstances including the child's reaction to the parents during the visits, in making this determination.
III. CONCLUSION
Based upon the foregoing, the Court finds by a fair preponderance of the evidence that Autumn D. is a neglected child. Further, the Court finds by clear and convincing evidence that the adjudicatory grounds for termination have been proven and that it is in the best interest of the child, Autumn D., to terminate the parental rights of her mother and father. Obviously, in view of the Court's findings, the Order of Temporary Custody is sustained and the Court has found that continuing efforts to reunify the child with her parents are no longer appropriate. The Court hereby terminates the parental rights of Linda D. and Philip D. to their child Autumn D. DCF is hereby appointed as Statutory Parent for Autumn.
THE COURT
Dennis Eveleigh, J.